

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| HORACIO VASQUEZ, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | No. 04 C 1798 |
| v. ) | |
| ) | Judge John W. Darrah |
| CENTRAL STATES JOINT BOARD, et al., ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs, Horacio Vazquez, Hermes Ruiz, Jeffrey Keating and Kevin Kane, brought suit against Defendants, Central States Joint Board ("CSJB"), the International Union of Allied Novelty & Production Workers (the "International Union") (collectively, the "Union Defendants"), and several individuals associated with the Union Defendants, alleging that Plaintiffs' removal from appointed and elected positions within the union and expulsion from union membership violated the Labor Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 401 *et seq.*, and other laws. Before the Court are Defendants' motions for summary judgment – one filed by the Union Defendants and a second filed by Defendants Mark Spano and Steve Torello.[1]

---

[1] On November 24, 2009, the Court denied the Union Defendants' motion to file a memorandum in support of their motion for summary judgment in excess of fifteen pages. The Union Defendants responded by filing a fourteen-page motion for summary judgment and a fifteen-page motion in support of that motion, essentially shifting the background and introductory sections of their memorandum to their motion. Such conduct is disappointing and unprofessional conduct and disregards the intent of the Court's order.

## BACKGROUND

*Undisputed Facts*

The International Union is a labor organization, as defined in 29 U.S.C. § 402(i), and is comprised of joint boards and local unions. (Defs.' 56.1(a)(3) ¶ 1.) The CSJB is a labor organization, as defined in 29 U.S.C. § 402(i), and is one of the joint boards affiliated with the International Union. (*Id.* ¶ 1.) Prior to January 2002, Spano was a Vice President of the International Union, Secretary-Treasurer of the CSJB and President of Local 20. (*Id.* ¶¶ 1, 2.) In January 2002, Spano was appointed Secretary Treasurer of the International Union and President of the CSJB. (*Id.* ¶ 2.)

Prior to January 2004, Torello was a member of the Executive Board of the International Union, a Vice President of CSJB and the elected President of Local 18. (*Id.* ¶ 5.) In April 2004, Torello was appointed Secretary Treasurer of the International Union. (*Id.* ¶ 5.)

Until April 2004, Ruiz was the President of the International Union, the First Vice President of the CSJB Executive Board, the elected President of Local 24, the Servicing Director of the CSJB and an appointed CSJB business agent. (*Id.* ¶ 3.)

Prior to January 2002, Keating was a Vice President of the International Union, a Vice President of the CSJB, the elected President of Local 16 and an appointed CSJB business sgent. (*Id.* ¶ 4.) In January 2002, Keating was appointed as Secretary Treasurer of the CSJB. (*Id.* ¶ 4.) Keating held these offices until April 2004. (*Id.* ¶ 4.)

Prior to his removal from office in April 2004, Kane was the Secretary of the Manufacturing Production & Service Workers Union, Local 24 and an appointed CSJB business agent. (*Id.* ¶ 7.)

Prior to January 2002, Vazquez was Vice President of Production Workers, Local 10, and an appointed CSJB business agent. In January 2002, Vazquez was appointed President of Local 10. (*Id.* ¶ 6.)

On March 28, 2002, at a special meeting, the CSJB Executive Board passed a resolution limiting the authority of the CSJB president to set initial salaries for business agents. (*Id.* ¶ 8.) Board Members Torello, Ruiz, Keating, and three others voted in favor of the resolution. (*Id.* ¶ 8.)

On August 4, 2003, Spano met with Vazquez. (*Id.* ¶ 19.) During the meeting, Spano fired Vazquez from his position as a CSJB business agent. (*Id.* ¶ 19.) Vazquez remained a member and President of Local 10. (*Id.* ¶ 19.) Vazquez filed a grievance, protesting his termination, which was heard on October 21, 2003. (*Id.* ¶ 20.) Vazquez attended the hearing, read a statement and left before the evidence was presented. (*Id.* ¶ 20.) On November 4, 2003, a grievance arbitration panel issued a decision, upholding Vazquez's discharge. (*Id.* ¶ 20.)

On November 8, 2002, the CSJB Executive Board unanimously approved a resolution to enter into a contract with American Income Life ("AIL") to provide free life insurance benefits to CSJB members in exchange for allowing AIL to market its insurance products to CSJB members through mailings. (*Id.* ¶ 16.) Spano did not participate in the decision to enter into the contract because his wife was an agent for AIL. (*Id.* ¶ 16.) The CSJB Executive Board entered into a second and similar agreement with AIL on August 15, 2003. (*Id.* ¶ 17.)

Between April 2002 and July 2003, the CSJB membership was declining. (*Id.* ¶ 24.) Spano and Keating reported to the CSJB Executive Board on the financial issues and the need for a layoff. (*Id.* ¶ 24.) On August 8, 2003, the CSJB laid off Kane as an appointed business agent,

3

purportedly for lack of work. (*Id.* ¶ 25.) The layoff did not affect Kane's status as an elected officer or member of Local 24. (*Id.* ¶ 25.) Kane filed a grievance, claiming that he was laid off outside of seniority. (*Id.* ¶ 26.)

On August 18, 2003, Kane hired the law firm of Whitfield & McGann to represent him regarding his layoff from employment with the CSJB. (*Id.* ¶ 27.) Whitfield & McGann filed an action in the Circuit Court of Cook County, seeking an order to compel the CSJB to arbitrate Kane's grievance. (*Id.* ¶ 27.) On June 1, 2004, the grievance committee issued its decision, denying Kane's grievance and upholding his layoff. (*Id.* ¶ 28.)

On September 4, 2003, Ruiz and Kane caused the Local 24 Executive Board to pass a resolution providing that Local 24 would pay the legal costs of any member of the Local 24 Executive Board that might be in need of legal representation. (*Id.* ¶ 30.) At the September 12, 2003 meeting of the CSJB Executive Board, the officers discussed Local 24's adoption of the resolution concerning legal fees. (*Id.* ¶ 32.) Spano reminded the CSJB officers, including Keating and Ruiz, that the CSJB Constitution prohibited local unions from incurring outside expenses without the approval of the CSJB Executive Board. (*Id.* ¶ 32.) Spano stated that Local 24's approval of payment of Kane's attorney's fees was illegal and that the expenditure would have to be approved by the CSJB Executive Board. (*Id.* ¶ 32.) On September 15, 2003, Spano sent a letter to Ruiz and Keating, restating his position regarding Local 24's payment of Kane's attorney's fees. (*Id.* ¶ 33.)

On November 6, 2003, Whitfield & McGann submitted an invoice in the amount of $6,416.35 to Local 24 for the services it rendered to Kane in connection with his employment dispute with the CSJB. (*Id.* ¶ 34.) On November 6, 2003, Ruiz and Kane caused Local 24 to

4

issue a check to Whitfield & McGann for the amount billed. (*Id.* ¶ 34.) On March 3, 2004, the CSJB hired attorney Paul Peters to investigate whether officers of Local 24 had engaged in misconduct relating to the payment of Kane's attorney's fees. (*Id.* ¶ 35.) The CSJB ordered all CSJB and local union officers and employees to cooperate in the investigation. (*Id.* ¶ 35.) Peters reported to the CSJB that neither Ruiz, Kane, nor Keating cooperated in the investigation. (*Id.* ¶ 36.)

On March 11, 2004, Ruiz attempted to place the CSJB in emergency trusteeship and named Keating as the trustee over the CSJB. (*Id.* ¶ 40.) In the notice of trusteeship, Ruiz objected to the deal with AIL, stating that mailings from the company were a misleading and deceptive business practice and a misuse of the list of members of the CSJB. (*Id.* ¶ 40.)

On March 12, 2004, the International Union Executive Board (the "Executive Board") held a special meeting to address the emergency trusteeship. (*Id.* ¶ 41.) Ruiz was aware of the meeting but did not attend because he thought it was illegal. (*Id.* ¶ 41.) Keating also did not attend. (*Id.* ¶ 41.) At the meeting, a majority of the Executive Board determined that there was no emergency requiring a trusteeship prior to a hearing, suspended the powers of the trustee and set a hearing on the trusteeship for March 18, 2004. (*Id.* ¶ 42.)

On the same day that the Executive Board met, March 12, 2004, Ruiz filed a complaint in the United States District Court for the Northern District of Illinois, seeking a temporary restraining order and a preliminary injunction. (*Id.* ¶ 43.) The same day, a hearing was held before Judge Castillo on Ruiz's motion for a temporary restraining order. (*Id.* ¶ 44.) At the hearing, Ruiz argued that the reason for the temporary restraining order was the AIL mailings and that the emergency was created because of complaints that the mailings violated HIPAA.

(*Id.* ¶ 44.) The CSJB argued that the trusteeship was brought in bad faith in response to Spano's reducing Ruiz's wages as a CSJB business agent and the investigation into Local 24's payment of Kane's attorney's fees. (*Id.* ¶ 44.) Judge Castillo denied the motion for a temporary restraining order noting that he did not believe it was a coincidence that Ruiz had sought emergency trusteeship immediately after Ruiz discovered that the CSJB had hired outside counsel to investigate Local 24's payments to Kane. (*Id.* ¶ 44.)

On March 16, 2004, the CSJB broadened the scope of the independent counsel's investigation to include the emergency trusteeship of the CSJB. (*Id.* ¶ 45.) The same day, Keating told Peters that he was the trustee over the CSJB and that, as trustee, he was suspending the investigation into Local 24. (*Id.* ¶ 46.) Also on that date, attorney Neil Holmen of Winston & Strawn sent a letter to Peters, asserting that Keating was the CSJB trustee, that independent counsel should provide Keating with a summary of his investigation to date and that his final report should be sent to Keating. (*Id.* ¶ 47.)

On March 16, 2004, Ruiz filed an amended motion for a temporary restraining order, again citing the deal with AIL as the basis for the trusteeship. (*Id.* ¶ 48.) On March 17, 2004, Judge Der-Yeghiayan held a hearing and denied the motion, determining that there was no reason to disturb Judge Castillo's findings. (*Id.* ¶ 49.)

On March 17, 2004, Peters issued his report on his investigation of Local 24 and the trusteeship over the CSJB. (*Id.* ¶ 50.) On March 18, 2004, two members of the Executive Board, Rocco Miranti and Johnnie Miranti, sitting as a panel, held a hearing on the CSJB trusteeship. (*Id.* ¶ 51.) Ruiz and Keating did not attend. (*Id.* ¶ 51.) At the hearing, the panel found that the Notice of Trusteeship was defective and that there was not valid basis for a

trusteeship. (*Id.* ¶ 51.) The panel also found that Ruiz's actions were motivated not by his desire to protect the International Union or the members of the CSJB but, rather, by his own personal interest in interfering with the investigation and his financial interest as an employee of the CSJB. (*Id.* ¶ 51.)

On March 18, 2004, after the hearing on the trusteeship, the Executive Board held a meeting. (*Id.* ¶ 53.) The Executive Board reaffirmed the appointment of the trustee panel and that the meetings of March 12, 2004, and March 18, 2004 were properly called. (*Id.* ¶ 53.) The Executive Board adopted the hearing panel's findings and conclusions and ordered that none of the expenses or costs of the trusteeship litigation would be paid by the International Union because the Executive Board, not the president, had the authority to hire legal counsel. (*Id.* ¶ 53.)

On March 19, 2004, the International Union's attorney sent a letter to Winston & Strawn, with copies to all International Union officers, including Keating and Ruiz, advising them that the International Union had not authorized the hiring of Winston & Strawn and that the International Union would not pay any of their legal bills. (*Id.* ¶ 54.) Between March 19 and March 22, 2004, Ruiz and Keating sent a letter to the International Union's investment custodian, instructing it to wire transfer $100,000 to Winston & Strawn. (*Id.* ¶ 55.) The wire transfer was completed on March 22, 2004.

Between March 19 and 25, 2004, Keating continued to act as CSJB trustee by purporting to suspend the officers of the CSJB and by purporting to suspend Local 20 and recommending that it be placed under trusteeship. (*Id.* ¶ 56.) On March 19, 2004, Local 18 member Benny Castro filed charges against Keating, Ruiz and Kane, based on his personal observations

and the finding set forth in Peters' report. (*Id.* ¶ 57.) On March 26, 2004, Castro amended his charges to include Keating and Ruiz's transfer of $100,000 to Winston & Strawn. (*Id.* ¶ 58.)

On April 5, 2004, pursuant to the International Union's Constitution, the Executive Board, serving as a trial committee, held a hearing on the charges against Ruiz, Keating and Kane. (*Id.* ¶ 60.) Ruiz, Keating and Kane attended and each read a statement in response to the charges but left when the trial committee began asking them questions. (*Id.* ¶ 62.) The Executive Board issued its decision on April 5, 2004. (*Id.* ¶ 64.) The decision removed Ruiz, Keating and Kane from their union offices and expelled them from union membership. (Defs.' Ex. 47.) On April 6, 2004, Spano terminated Keating and Ruiz from their positions as business agents for the CSJB. (Defs.' 56.1(a)(3) ¶ 69.) On May 4, 2004, Keating and Ruiz, but not Kane, appealed the Executive Board's decision to the International Union Convention. (*Id.* ¶ 72.) The International Union Convention delegates voted unanimously to deny the appeals by Ruiz and Keating. (*Id.* ¶ 75.)

*Plaintiffs' Allegations*

Plaintiffs' Second Amended Complaint ("SAC") alleges that certain officers and employees of the CSJB and the International Union "are actively engaged in a pattern of intimidation intended to suppress democratic dissent within the CSJB, its local member unions, and the International Union . . . and are influenced and controlled by elements of organized crime. (SAC ¶ 1.) Plaintiffs allege that they have openly opposed this corruption and, as a result, have been threatened with violence, removed from their elected and appointed positions and terminated from their employment. (*Id.* ¶ 3.)

8

Plaintiffs accuse Spano of leading the takeover of the unions. Plaintiffs allege that upon assuming the CSJB presidency in 2002, Spano "embarked on a systematic scheme to assert autocratic control over the Unions, eliminate any opposition to his authority, and limiting democracy within the Unions, and to turn the Unions over to elements of organized crime." (*Id.* ¶ 89.) Plaintiffs allege that in response to their opposition of Spano's scheme, Spano made numerous threats, including threats of physical violence, if Plaintiffs continued to oppose him. A full account of Plaintiffs' allegations, all of which are denied by Defendants, can be found in Judge Filip's opinion granting in part and denying in part Defendants' motion to dismiss.[2] *Vazquez v. Central States Joint Board*, 547 F. Supp. 2d 833, 839-43 (N.D. Ill. 2008).

## LEGAL STANDARD

Summary judgment is appropriate when there remains no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.*, 40 F.3d 146, 150 (7th Cir. 1994). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (*Celotex*). Thus, although the moving party on a motion for summary judgment is responsible for demonstrating to the court why there is no genuine issue of material fact, the nonmoving party must go beyond the face of the pleadings, affidavits, depositions, answers to interrogatories, and admissions on file to demonstrate, through specific evidence, that there remains a genuine issue of material fact and show that a rational jury could return a verdict in the nonmoving

---

[2]This case was originally assigned to Judge Filip until March 6, 2008.

9

party's favor. *Celotex*, 477 U.S. at 322-27; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254-56 (1986) (*Anderson*); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (*Matsushita*); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 923 (7th Cir. 1994).

Disputed facts are material when they might affect the outcome of the suit. *First Ind. Bank v. Baker*, 957 F.2d 506, 507-08 (7th Cir. 1992). When reviewing a motion for summary judgment, a court must view all inferences to be drawn from the facts in the light most favorable to the opposing party. *Anderson*, 477 U.S. at 247-48; *Popovits v. Circuit City Stores, Inc.*, 185 F.3d 726, 731 (7th Cir. 1999). However, a metaphysical doubt will not suffice. *Matsushita*, 475 U.S. at 586. If the evidence is merely colorable or is not significantly probative or is no more than a scintilla, summary judgment may be granted. *Anderson*, 477 U.S. at 249-50.

## ANALYSIS

Plaintiffs' Second Amended Complaint, filed on October 17, 2006, contained eleven counts, brought under § 101(a)(1) and (2) of the LMRDA, § 101(a)(5) of the LMRDA, state contract law, and RICO. On February 29, 2008, the Court ruled on Defendants' motion to dismiss, dismissing all claims except the following: Plaintiffs' LMRDA § 101(a)(2) claims for removal from elected and appointed office (Counts I, IV, VI and VIII) and Plaintiffs' LMRDA § 101(a)(5) claims from removal from membership (Counts V, VII and IX).[3]

*Claims for Discharge from Union Employment*
*Under § 101(a)(2) of the LMRDA*

Plaintiffs allege that the termination of their employment as appointed CSJB business agents violated § 101(a)(2), which guarantees the right of free speech to union members.

---

[3] Vazquez was not expelled from union membership. Therefore, Count II, which alleged a claim from removal of Vazquez from membership under § 101(a)(5), has been dismissed.

10

Defendants argue that these claims are not viable because § 101(a)(2) does not protect appointed union employees from loss of employment. Defendants cite *Vought v. Wisconsin Teamsters Joint Council No. 39*, 558 F.3d 617 (7th Cir. 2009) (*Vought*), in support of their position. According to Defendants, *Vought* reaffirmed that appointed union employees, as opposed to elected union employees, could not sue under the LMRDA for loss of their employment.

Plaintiffs counter that their claims are actionable because their terminations were part of a scheme to stifle dissent. Plaintiffs cite several cases holding that the termination of an appointed union employee is actionable under the LMRDA if the termination was part of a scheme to stifle dissent. *See Duffy v. IBEW, Local No. 134*, 780 F.Supp. 1185 (N.D. Ill. 1991) (*Duffy*); *Stroud v. Senese*, 832 F.Supp. 1206 (N.D. Ill.1993) (*Stroud*); *Glover v. Ossey*, 1993 WL 303120 (N.D. Ill. August 05, 1993) (*Glover*). Defendants counter that Plaintiffs mistakenly rely on out-of-date case law that substantially predates *Vought* and other more recent authority from the Seventh Circuit, including *Brunt v. SEIU*, 284 F.3d 715 (7th Cir. 2002). According to Defendants, *Vought* and *Brunt* make clear that no claim for loss of appointed union employment is viable under the LMRDA.

The seminal case on this issue is *Finnegan v. Leu*, 456 U.S. 431 (1982) (*Finnegan*). In *Finnegan*, the Court addressed whether a union president's firing of appointed business agents who had supported a rival candidate in a recent election violated § 102 of the LMRDA. *Id.* at 432. Finding that it did not, the Court held that § 102 "does not restrict the freedom of an elected union leader to choose a staff whose views are compatible with his own." *Id.* at 441. The Court reasoned that ensuring democratic governance of unions was the "overriding objective" of the LMRDA and that "the ability of an elected union president to select his own administrators is an

11

integral part of ensuring a union administration's responsiveness to the mandate of the union election." *Id.* Subsequently, in *Sheet Metal Workers' International Association v. Lynn*, 488 U.S. 347, 349 (1989) (*Lynn*), the Court addressed the question of whether an *elected* business agent's firing for statements made in opposition to union leadership violated the LMRDA. The Court answered the question in the affirmative, stressing that because the fired business agent had been elected, his removal denied union members the representative of their choice, contrary to the pro-democratic goals of the act. *Id.* at 355. Thus, the key question under the LMRDA is whether the terminated union employee was elected or appointed.

However, several courts have looked to the Court's language in *Finnegan* to carve out an exception to the rule that an appointed union employee may not bring a LMRDA claim based on his dismissal. Specifically, the *Finnegan* Court stated that the LMRDA placed limits "on a union's authority to utilize dismissal from union office as 'part of a purposeful and deliberate attempt . . . to suppress dissent within the union,'" *Id.* (quoting *Schonfeld v. Penza*, 477 F.2d 899, 904 (2d Cir. 1973)). Thus, some cases, including those cited by Plaintiffs here, hold that an appointed union employee may bring an action under the LMRDA if he was terminated as part of a scheme to stifle dissent within the union. *See Duffy*, 780 F.Supp. at 1189-90 (noting that the Seventh Circuit had not yet ruled whether *Finnegan* barred suits under the LMRDA by appointed union employees who claimed they had been disciplined as a means of suppressing dissent); *Stroud*, 832 F.Supp. at 1213 (holding that union members discharged from unelected positions could state a claim for retaliatory discharge under § 102 if they could show that their firing "was part of a pattern of intimidation and stifled dissent"); *Glover*, 1993 WL 303120, at *3 ("the

[*Finnegan*] Court did indicate that an exception to this general rule may exist when the ousting of a union officer is 'part of a deliberate attempt . . . to suppress dissent within the union'") (quoting *Finnegan*, 456 U.S. at 441).

Defendants rely on *Brunt* and *Vought* to argue that to the extent this may have been an open question at the time *Duffy*, *Stroud* and *Glover* were decided, it is no longer so. Any possible exception raised in those cases, Defendants argue, has since been rejected by the Seventh Circuit. However, neither *Brunt* nor *Vought* addresses the proposed exception directly. And *Brunt*, to the extent it does, appears to favor Plaintiffs' position. In *Brunt*, three unelected union employees brought suit under the LMRDA after they were fired by the union president for their failure to support his reelection bid. *Brunt*, 284 F.3d at 718. The court upheld the lower court's dismissal of the case, relying on *Finnegan* for the proposition that the LMRDA does not restrict an elected union leader's freedom to choose his own staff. *Id.* at 719. However, the court also addressed the district court's refusal to permit plaintiffs to amend the complaint to add factual allegations to assert a violation of § 102. The court stated that "[t]his section [§ 102] permits any union member to sue for relief if he or she was discharged as part of a purposeful and deliberate attempt to suppress dissent within the union." *Id.* at 720. The court cited *Stroud* in support of that statement. Thus, *Brunt* could be read to support Plaintiffs' position, also set out in *Stroud*, *Duffy* and *Glover*, that an unelected union employee who has been discharged may bring a claim under the LMRDA if he alleges his firing was part of a scheme to suppress dissent within the union.

Furthermore, the Court has already ruled in favor of Plaintiffs on this issue in this case. In his January 25, 2007 opinion, Judge Filip held that Vazquez stated a claim under § 102 for

discharge from his appointed position because he alleges that he was terminated as part of a deliberate attempt to stifle dissent. *Vazquez v. Central States Joint Board*, 04 C 861, Slip Op. January 25, 2005, at 26-27.

Thus, the question is whether *Vought*, which postdates both *Brunt* and Judge Filip's January 25, 2007 opinion in this case, requires a different result. The Court finds that it does. The Seventh Circuit's language in *Vought* categorically rules out LMRDA suits based on loss of union employment. Reviewing *Finnegan* and subsequent cases, the court stated: "If these cases left any doubt about the viability of appointed employment claims-and it's hard to see how they could-we surely erased it in *Brunt*." *Vought*, 558 F.3d at 622. Furthermore, courts interpreting *Finnegan* to allow an exception when the termination was part of a scheme to suppress dissent have held the Court's language regarding such schemes carves out an exception to the rule favoring an elected leader's freedom to chose his own staff. Yet the *Vought* court reads the same passage of *Finnegan* to lead to the opposite conclusion: "to the extent the [LMRDA] limits action taken 'as part of a purposeful and deliberate attempt . . . to suppress dissent within the union,' *it doesn't do that at the expense of* 'the freedom of an elected union leader to choose a staff whose views are compatible with his own.'" *Vought*, 558 F.3d at 621 (quoting *Finnegan*, 456 U.S. at 441) (citations omitted) (emphasis added). Thus, *Vought's* application of *Finnegan* leaves little room for the exception for schemes to suppress dissent.

Therefore, because Seventh Circuit precedent is an absolute bar to all LMRDA suits for loss of appointed union employment, Defendants' motion to dismiss is granted with respect to Plaintiffs' claims under § 101(a)(2) to the extent they are based on loss of appointed positions.

*Claims for Removal from Office and Expulsion for Membership
Under § 101(a)(2) of the LMRDA*

To establish retaliation in violation of § 102(a)(2), Plaintiffs must demonstrate that: (1) their conduct was an exercise of the right to free speech protected under the LMRDA; (2) Defendants took actions against them because of their exercise of rights; and (3) Plaintiffs were damaged and suffered an injury as a proximate result of Defendants' actions. *Kauffman v. IBEW, Local Union 461*, 124 F.Supp.2d 1127, 1131 (N.D. Ill. 2000) (citing *Black v. Ryder/P.I.E. Nationwide, Inc.*, 970 F.2d 1461, 1469 (6th Cir. 1992)).

Defendants first argue that instances of free speech alleged by Plaintiffs were not protected under the LMRDA because they were not made to the rank-and-file union membership but, rather, were limited to private conversations between themselves and with Spano.

The holdings of the cases cited by Defendants do not persuasively support the Defendants' argument. Certainly, the topic of the protected speech must be "a matter of union concern." *Hylla v. Transportation Communications International Union*, 536 F.3d 911, 917 (8th Cir. 2008) (*Hylla*). The speech cannot "involve[] entirely personal interest." *Id.* And Defendants have found some support for the position that the speech must be voiced within the union rather than to outsiders. *See Helmer v. Briody*, 759 F.Supp. 170, 176-77 (S.D.N.Y. 1991) (reporting of union corruption to outside authorities was not speech protected by the LMRDA). Yet their contention that any protected speech must be made to a membership-wide audience finds no support in the cited case law.

Defendants next argue that Plaintiffs cannot show causation; that is, that Plaintiffs cannot show that they were expelled and removed from office because of their exercise of their rights

15

under § 102(a)(2). Defendants argue that Plaintiffs cannot show causation because they cannot show that either Castro, who filed charges against Plaintiffs, or any members of the panel who heard the charges against Plaintiffs on April 5, 2004, were aware of Plaintiffs' allegations regarding Spano. Furthermore, Defendants argue, Plaintiffs' allegations regarding Spano are not temporally proximate to the April 5, 2004 decision. The speech that Plaintiffs allege to be protected, Defendants argue, occurred months or, in some cases, years before the charges were brought against Plaintiffs.

In response, Plaintiffs do not dispute Defendants' assertion that they cannot show that the panel members knew of their allegations regarding Spano. Rather, with respect to Keating and Ruiz, Plaintiffs assert that the conduct protected under § 102(a)(2) was not Plaintiffs' allegations regarding Spano but, rather, Ruiz and Keating's actions regarding the trusteeship, which, Plaintiffs argue, were well known to the members of the panel. Thus, with respect to Keating and Ruiz, Plaintiffs have effectively dropped their contention that it was their statements regarding Spano that led to their termination. With respect to Kane, Plaintiffs likewise do not assert that they can show anyone on the panel had knowledge of the statements against Spano. Instead, Plaintiffs rely on temporal proximity between Kane's alleged complaints to Spano and his expulsion. But there is no close temporal proximity. The first complaint by Kane to Spano cited by Plaintiffs occurred in Spring of 2002; the last occurred a year later in Spring 2003. Kane was not expelled until a year later in April 2004. Therefore, to the extent the protected speech claimed by Plaintiffs was their alleged comments regarding Spano, they cannot show causation between that speech and their April 5, 2004 removals and terminations.

Furthermore, Plaintiffs cannot salvage their § 101(a)(2) claims by asserting that their actions regarding the trusteeship declared by Ruiz were protected speech. The goal of § 101(a)(2) is to protect the freedom of expression of union members. *See Finnegan*, 456 U.S. at 435-36. Ruiz's action, as President of the International Union, to place the CSJB in trusteeship, manifestly does not fall within the boundaries of this protection. *See Id.* at 436-37 (section 101(a)(2) intended to protect rank-and-file union members – not union officers).

Therefore, Defendants' motion for summary judgment is granted with respect to Plaintiffs' claims for removal from office and expulsion from membership under § 101(a)(2).

*Claims for Expulsion from Membership Under § 101(a)(5)*

Plaintiffs claim that their expulsion from union membership violated § 101(a)(5), which provides:

> "No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing."

29 U.S.C. § 411(a)(5).

The International Board expelled Kane, Keating and Ruiz after finding, *inter alia*, that (1) Ruiz and Kane caused Local 24 to pay Kane's personal attorney's fees; (2) Kane, Ruiz and Keating failed to cooperate with the investigation into Local 24; and (3) Ruiz and Keating abused Ruiz's authority as International President by attempting to place the CSJB in trusteeship to block the investigation into Local 24.

Plaintiffs allege that the charges were "non-meritorious" and that the hearing was not fair and impartial. (SAC at ¶ 251, 257.) Defendants argue that it is not this Court's role to determine

17

if Plaintiffs violated union rules. Rather, the Court should uphold the decision so long as the record reflects "some evidence" to support the charges. *See International Brotherhood of Boilermakers v. Hardeman*, 401 U.S. 233, 246 (1971). Here, Defendants argue, there was more than some evidence supporting the charges.

In response, Plaintiffs drop their argument that the charges were non-meritorious and instead press their argument that the panel was biased. As noted, § 101(a)(5) affords union members "a full and fair hearing." An essential component of a fair hearing is an impartial decision maker. *See Knight v. International Longshoremen's Ass'n*, 457 F.3d 331, 342-43 (3d Cir. 2006). Here, there is at least a factual issue as to whether the members of the disciplinary committee were biased. Certainly, if Plaintiffs' accusations regarding Spano's threats are credited by the jury, Plaintffs may be able to show bias.

Defendants argue that the issue of bias is irrelevant because Plaintiffs do not contest the factual findings upon which the panel's decision was based but, rather, argue that their actions were justified. However, the decision of the panel consists not only of the factual findings but also the penalty imposed. Here, even if Plaintiffs could not contest the charges, the impartiality of the panel might well have had an impact on the punishment. Defendants cannot show that a different panel might not have expelled Plaintiffs from union membership.

*Exhaustion of Union Remedies*

Defendants argue that Plaintiffs' claims are barred because they failed to exhaust available remedies within the union. Section 101(a)(4) provides that a member may be required to exhaust reasonable internal union procedures before bringing suit in federal court. 29 U.S.C. § 411(a)(4). However, the court may excuse the exhausting requirement in certain

circumstances, including when "union officials are so hostile [to the plaintiff] that he could not hope to obtain a fair hearing on his claim." *Clayton v. International Union*, 451 U.S. 679, 689 (1981). The court's authority on this issue is "permissive rather than mandatory." *Bee v. Local 719, United Auto Workers*, 744 F.Supp. 835, 837 (N.D. Ill. 1990). Here, Plaintiffs have, at minimum, raised a factual issue as to whether they could obtain a fair hearing. Thus, the Court will not bar Plaintiffs' claims on these grounds.

*Liability of the CSJB*

In a single sentence of their opening summary judgment brief, Defendants state that the CSJB is entitled to summary judgment because it is not alleged to have removed Plaintiffs from office or expelled them from membership. Plaintiffs respond with a number of theories of liability, none of which are fully developed. Neither side, including Defendants in their reply, cite any case law in support of their contrary positions. Therefore, the issue has been inadequately raised in the initial brief and subsequently insufficiently briefed to grant summary judgment on that basis.

*Individual Liability*

Defendants Spano and Torello have moved for summary judgment. Plaintiffs do not contest the motion with respect to Torello. Plaintiffs also do not contest that Spano is immune from liability for his role as a member of the April 5, 2004 panel. Thus, because Plaintiffs' claims under § 101(a)(5) for denial of a full and fair hearing are the only surviving claims, Plaintiffs have no viable claims remaining against Spano. Therefore, summary judgment is granted with respect to Spano and Torello.

19

*Counterclaims*

Defendants moved for summary judgment with respect to their first and second counterclaims: breach of contract and breach of fiduciary duty. Plaintiffs argue that the Court denied Defendants' motion for leave to file a motion for summary judgment on the counterclaims in open court on November 24, 2009, and have attached the transcript from that hearing. Defendants counter that the Court merely denied their motion to file a *separate* summary judgment motion as to the counterclaims. Nothing in the Court's order, Defendants argue, prevented them from moving for summary judgment on both Plaintiffs' claims and the counterclaims in a single motion.

Reviewing the transcript, both sides offer a reasonable interpretation of the Court's order. As it stands, the parties have not fully briefed the issue of whether summary judgment is warranted on these claims. Therefore, Defendants' motion is denied with respect to the counterclaims.

## CONCLUSION

For the reasons stated above, Defendants Spano and Torello's motion for summary judgment is granted. The Union Defendants' motion for summary judgment is denied with respect to Plaintiffs' claims under § 101(a)(5) for expulsion from union membership (Counts V, VII and IX), denied with respect to Defendants' counterclaims, and granted with respect to all other claims.

Dated: February 8, 2010

JOHN W. DARRAH
United States District Court Judge